FELIPE SEGARRA SERRA ETC., ET AL., Plaintiffs and Appellees, *v.* CARMEN RIVERO WIDOW OF LLORÉNS TORRES, ETC., ET AL., Defendants and Third-Party Plaintiffs and Appellants; GABRIEL DE JESÚS LLORÉNS JIMÉNEZ, Intervener-Defendant and Third-Party Plaintiff and Appellant, MONACILLOS INVESTMENT CORPORATION ET AL., Third-Party Defendants and Appellees; MIRANDA & EGUÍA, INC., Third-Party Defendant and Appellee.

No. R-68-107.     Decided April 30, 1970.

*Héctor González Blanes* and *Luis R. Polo* for appellants. *González, González, Jr., González Oliver & Novak* for appellees. *José Pérez Rodríguez* for Miranda & Eguía, Inc.

MR. JUSTICE TORRES RIGUAL delivered the opinion of the Court.

This is a complicated case on account of its nature as well as for the multiplicity of its allegations. The point which occupies our attention, however, is clear and specific. It is a question of the effect of the cautionary notices of lis pendens against a deed of sale executed prior to the notice, but not reproduced in a public deed and, therefore, not recorded.

It is indispensable to make a summary of the facts for a complete comprehension of the case and our decision.

Felipe Segarra and the Heirs of Lloréns Torres[1] were owners in equal parts of a property of about 30 cuerdas located in the Ward Monacillos of Río Piedras. On November 29, 1951, they agreed, by public deed No. 176 executed before Notary Enrique Córdova Díaz, to the physical division of this property into two different parcels of fifteen cuerdas each, adjudicating to appellants, Heirs of Lloréns, parcel "A," and parcel "B" to appellee, Felipe Segarra. The parties also agreed in said deed that Felipe Segarra would undertake the urbanization of parcel "A," contributing from his own funds all the expenses of the project and dividing the benefits in half among themselves, after crediting the Heirs of Lloréns with the amount of $45,000 for the value of the parcel and the costs of urbanization to Segarra.[2] Deed No. 176 appears recorded in the Registry of Property.

---

[1] The Heirs of Lloréns Torres are composed of the widow, Carmen Rivero Rodríguez, deceased after the complaint had been filed, and her sons, Elio, José, and Luis Lloréns Rivero, and intervener Gabriel de Jesús Lloréns Jiménez.

[2] Sometime after the agreement had been made, parcel "A" became frozen as a result of a litigation which lasted more than 12 years. See *Ramos Buist* v. *Heirs of Lloréns Torres,* 92 P.R.R. 436 (1965).

On account of the Heirs of Lloréns alleged waiver to the urbanization agreement, Felipe Segarra filed, on July 21, 1965, a complaint of specific performance of the agreement in the case at bar. The Heirs of Lloréns admitted in their answer to the complaint the execution of deed No. 176, but denied its validity alleging vices in the consent because of fraud, error, violence, and intimidation. They also alleged three special defenses, six counterclaims, and a complaint against third party[3] to bring into the suit the Monacillos Investment Corp., an entity incorporated by Felipe Segarra for the urbanization of parcel "A," and in favor of which he conveyed the title of ownership of said parcel in 1957, title which also appears recorded in the Registry of Property. Simultaneously with the filing of their answer on February 7, 1966, the Heirs of Lloréns requested from the Registrar of Property of Río Piedras and the Third Section of San Juan, the annotation of the notice of lis pendens. The Monacillos Investment Corp. appeared without delay before the trial court requesting an Order to Show Cause and alleging, insofar as pertinent herein, that since the month of August 1960 and April 1964, it had agreed to sell to Miranda & Eguía, Inc., two lots to be segregated from the Monacillos Shopping Center urbanization project,[4] it being ready to sign the deeds of sale since February 7, 1966, that is, prior to the date of the cautionary notice of lis pendens, reason for which said cautionary notice could not affect the rights acquired by the latter, it being proper to order, after a hearing to that effect,

[3] For the purposes of the case it is not necessary to point out the numerous and tedious allegations in the answer to the complaint.

[4] The sale of both lots was performed through the execution of documents by the parties which contained identical conditions, except that the sale agreed upon in August 1960, was by means of a private document and before witnesses, and the sale of 1964 was by means of a document acknowledged before a notary:

In both cases the purchaser issued checks for $2,000 and $60,000, respectively, as down payment in favor of the Monacillos Investment Corp., which were duly cashed by the latter.

that the Monacillos Investment Corp. could execute the corresponding deed free of the effects of the notice.

Subsequent to this Motion to Show Cause, the Heirs of Lloréns amended the complaint against third party to bring Miranda & Eguía, Inc.,[5] also into the suit. In view of this new allegation, the trial court determined that it did not lie to enter into the merits of the Motion to Show Cause until Miranda & Eguía, Inc., answered said complaint against third party.

For the purpose of keeping the facts clear, it is convenient to indicate that, although Miranda & Eguía, Inc., has been brought into this suit as a third-party defendant, it may not be considered properly as such because in the complaint against third party there is no allegation of liability on the part of the latter towards the third-party plaintiffs-appellants Heirs of Lloréns, in case the latter were liable on their part to plaintiff, Felipe Segarra. Its position in this case is rather that of an intervener brought into the suit in an unusual manner. The evident purpose of the Heirs of Lloréns in bringing it into the suit by means of a third-party complaint was to elucidate in these same proceedings the effects of the annotation of the notice of lis pendens over the rights acquired by Miranda & Eguía, Inc., through the deeds of sale executed in 1960 and 1964. Thus it arises from the very allegations of the complaint against third party, where it is stated that since Miranda & Eguía, Inc., could be affected in its alleged rights, it is included in the suit so that it may allege what it deems pertinent, all that to avoid multiplicity of actions. Miranda & Eguía, Inc., did not raise any objection to this irregular proceeding, obviously also because of its interest in procuring that its rights be rapidly elucidated.

---

[5] The Hormigonera, Inc., Metropolitan Builders, Inc., and Lederle Laboratories Co., which also, it was alleged, had acquired by purchase lots in the Monacillos Shopping Center project of urbanization, were also included. With respect to these parties, the court dismissed the petition for summary judgment and they are not involved in the instant review.

In its answer to the complaint against third party, Miranda & Eguía, Inc., alleged that it had acquired from the Monacillos Investment Corp. the lots in question by means of deeds of sale executed on August 13, 1960 and April 3, 1964, in good faith, without having knowledge of any defect in the title of its vendor and without there appearing from the Registry of Property, nor from any other source, any cause of nullity. Miranda & Eguía, Inc., filed, jointly with its answer, a petition for summary judgment incorporating to the same its sworn answer as well as several documents from which there appeared, effectively, that the sale of the lots in question had been perfected prior to the notice of lis pendens, that Miranda & Eguía, Inc., had paid the amounts of $2,000 and $60,000 as part of the price of the respective lots, and that it had also incurred substantial expenses on account of drawings for the construction of physical facilities for its business in said lots.[6] The Heirs of Lloréns rebutted the Motion for Summary Judgment, relying on the fact that although Monacillos Investment Corp. alleged that the said lots were no longer its property, however, subsequent to the notice of lis pendens it submitted a New Amended Plan of

[6] The following documents were attached to the Motion for Summary Judgment:

a) Copy of deed No. 15 of April 21, 1947, executed before Notary Arturo O'Neill, in which defendant Elio Lloréns Rivero confers power to codefendant Carmen Rivero widow of Lloréns, to perform the division and the agreement of urbanization executed through the aforesaid deed No. 176.

b) Copy of deed No. 176, executed on November 29, 1951, by plaintiff and defendants, before Notary Enrique Córdova Díaz.

c) Copy of the certificate of the registry concerning the recording of said deed.

d) Copy of the deeds of sale executed in August 1960 and April 1964.

e) Copy of check No. 3347 of August 8, 1960, issued by Miranda & Eguía, Inc., in favor of Monacillos Investment Corp., and copy of check No. 2173 of April 3, 1964, issued by Miranda & Eguía, in favor of Monacillos Investment Corp.

f) The petition for Order to Show Cause, sworn by Felipe Segarra.

g) Sworn statement of Pablo Eguía Dávila, President of Miranda & Eguía, Inc.

Partial Recording to the Planning Board, alleging in the request that said lots were its property and that the deeds of sale executed in August 1960 and April 1964 were void, because they were executed in violation of the Act and the Puerto Rico Planning Board Regulations, because the authorization for the segregation of said lots had not been previously obtained from the Planning Board.

The trial court rendered partial summary judgment, concluding that the cautionary notice of lis pendens does not affect the rights acquired by a deed of sale perfected pursuant to law prior to the notice, although the same has not been recorded or a public deed executed. Consequently, it ruled that the title of Miranda & Eguía, Inc., over the lots in question was not subject to the annotation of the notice of lis pendens and ordered to proceed to execute the corresponding deeds of sale.

Subsequently, at the request of the Heirs of Lloréns Torres, the trial court made additional findings of fact to the effect that the Monacillos Investment Corp. was a corporation composed exclusively by plaintiff, Felipe Segarra and his children, Mildred and Luis Felipe Segarra Boerman; that as of the date of the notice of lis pendens the sales in favor of Miranda & Eguía, Inc., had not been filed or recorded in the registry. It also concluded that although in executing the deeds of sale in favor of Miranda & Eguía, Inc., the subdivision of the lots had not been approved by the Planning Board, this was entered in said deeds and the same were subjected to the condition that the vendor would comply with the requirements of the Board, and that also the Plan of Partial Recording of the lots sold to Miranda & Eguía, Inc., was approved by the Resolution of the Board of June 17, 1964, that is, before the complaint was filed and the notice of lis pendens entered.

Against this judgment, the Heirs of Lloréns timely filed the petition for review assigning the commission of several

errors.[7] In view of the fact that appellants do not discuss their assignments separately, but mix their arguments in a global discussion of their case, we will consider only the fundamental questions which arise from their brief, to wit: (a) effects of the cautionary notice of the lis pendens on the rights acquired by Miranda & Eguía, Inc., by virtue of the deeds of sale executed in 1960 and 1964, which in turn depends on, (b) the nature and scope of those rights, specifically, whether by virtue of the deeds and other pertinent facts, an act of conveyance of ownership was carried out, (c) nullity of the deeds on the ground that the approval of the segregation of the lots was not previously obtained from the Planning Board.

—I—

### Effects of the Cautionary Notice

It is advisable to make clear, from the beginning of the discussion, that in this appeal a problem of third person

---

[7] In summary, the errors assigned are reduced to:

a) Establishing that Miranda & Eguía, Inc., may not enjoy the character of a third-party mortgagee as it does not have the benefit of a recorded title.

b) That since it does not have such character, the rights it acquired from the Monacillos Investment Corp., by virtue of the deeds of sale executed in 1960 and 1964, were subjected to the results of the litigation in accordance with the annotation of the notice of lis pendens.

c) That the court erred in ordering the cancellation of the lis pendens, inasmuch as the lots had not yet been segregated or sold by public deed, the private deeds executed in 1960 and 1964 not being sufficient for the conveyance of ownership.

d) That the summary judgment violated Arts. 33 and 34 of the Mortgage Law.

e) That the trial court erred in concluding that the Monacillos Investment Corp. had conveyed said lots to appellee Miranda & Eguía, Inc., inasmuch as subsequently to the annotation of lis pendens it submitted a New Amended Plan of Partial Recording before the Planning Board, alleging in the request that said lots were its property.

f) That the alleged conveyances to Miranda & Eguía, Inc., are null, because the approval of the Planning Board for the segregation of the lots had not been previously obtained, and

g) That the trial court erred in issuing a summary judgment, there existing an undecided controversy which requires a plenary trial.

protected by the registry is not properly involved. Neither the judgment whose review we are considering confers such character to Miranda & Eguía, Inc., nor does the latter seek to shield itself under such condition, at least, at this stage of the litigation in which it does not yet have a recorded title in its favor that, as it is known, is an indispensable requirement to be considered a third-party mortgagee. Article 34, Mortgage Law, 30 L.P.R.A. § 59; *Olmedo* v. *Balbín*, 69 P.R.R. 547 (1949). We make this explanation because appellants devote a substantial part of their brief to this question.

■ The cautionary notice of lis pendens, either under § 91 of the Code of Civil Procedure, 32 L.P.R.A. § 455, or under Art. 42 of the Mortgage Law, 30 L.P.R.A. § 91[8]—the difference between both provisions is rather of form than of substance, *Hernández* v. *Registrar*, 67 P.R.R. 423 (1947)[9]— has the purpose of preserving the due respect to the administration of justice, avoiding that the judicial judgments

---

[8] Section 91 of the Code of Civil Procedure provides:

"In an action affecting the title or the right of possession of real property, the plaintiff, at the time of filing the complaint, and the defendant, at the time of filing his answer, when affirmative relief is claimed in such answer, or at any time afterwards, may file for record with the registrar of the district in which the property or some part thereof is situated, a notice of the pendency of the action, containing the names of the parties, the object of the action or defense, and a description of the property affected thereby. From the time of filing such notice for record only shall a purchaser or encumbrancer of the property affected thereby be deemed to have constructive notice of the pendency (of the action, and only of its pendency) against parties designated by their real names."

Article 42 of the Mortgage Law, provides:

"The following may request the entry of cautionary notices of their respective rights in the proper public registry:

"1. He who brings an action to recover the ownership of real property or the constitution, declaration, modification or extinction of any real right.

".     .     .     .     .     .     ."

[9] In *Hernández* v. *Registrar*, *supra*, we applied the procedure provided by Art. 42 of the Mortgage Law, in order that the right which arises from the lis pendens notice under § 91 of the Code of Civil Procedure may become effective, which signifies that both provisions may be used, indistinctly, for the same purposes.

become inofficious by acts of the defendant which prevent the execution of a judgment. It does not give nor take away rights. It only takes to the registry the existence of a suit which may place in jeopardy the recorded title. Its virtue consists, then, in making known to *future* acquirers the existence of a litigation whose result may be prejudicial to their interests. It is a simple warning which warns the *subsequent* acquirers of possible causes for nullity of the recorded titles so that they may not allege, later, ignorance of those causes of nullity.[10] To that effect, Roca Sastre tells us, at p. 413 of the third volume of his work *Derecho Hipotecario*:

"They constitute simple security measures, *in view of future acquirers*; reserves of record or defenses against the registry for the purpose of avoiding a fraudulent subsequent activity. Examine the majority of these notices and it will be seen in them that the preoccupation of the lawmaker in establishing them was to avoid that the defendant, conveyor of a defective title, etc., thwart with alienations or encumbrances the legitimate hopes of the ones favored by the notices. These notices, therefore, have the purpose of preserving unchangeable the conditions of compliance or effectiveness of a right, existent at the moment of performing the same." (Italics ours.)

Since what is annotated is the existence of a suit, while there is no suit pending, there cannot be a notice. Thus, the cited § 91 provides: ". . . the plaintiff, at the time of filing the complaint, and the defendant, at the time of filing his answer, . . . or at any time afterwards, may file for record . . . a notice of the *pendency* of the action. . . ."

---

[10] On the nature and scope of the cautionary notice of lis pendens, the following may be seen, among others: III Roca Sastre, *Derecho Hipotecario* 402 *et seq.*, Chapter XLVI; II Galindo and Escosura, *Comentarios a la Legislación Hipotecaria* 482 *et seq.* (1903); II Gómez de la Serna, *La Ley Hipotecaria* 1; II Campuzano, *Principios Generales de Derecho Inmobiliario* 15 *et seq.* (Second Ed. 1941); I Muñoz Morales, *Lecciones de Derecho Hipotecario* 281, Lesson 19 (1945); Capó Bonnafous, *Apuntes sobre las Anotaciones Preventivas* . . ., IX *Rev. Crítica de Derecho Inmobiliario* 282 (1933).

Consequently, the notice shall only prejudice since it is presented in the registry when the fact of the litigation is duly given publicity. To the effect, § 91 says: ". . . From the time of filing such notice for record only shall a purchaser . . . be deemed to have constructive notice of the pendency of the action. . . ."

It is by virtue of that publicity that the notice prejudices the subsequent acquirers. It is nothing else than the common and usual effects of the publicity of the registry: to prejudice *future* acquirers. It does not prejudice the *former* acquirers, although their titles, as in the case at bar, have not been recorded. Of course, unless some vice or cause of nullity of the recorded title appears clearly from the registry—Art. 34 of the Mortgage Law—but that would be, not by effect of the cautionary notice, but by the publicity of the vice which appears in the registry prior to the notice. This is so because the proper effect of the notice is to preserve the status quo of the property at the time of the filing of the complaint, and, if at that time the property has already been alienated, that is, an act of conveyance of the ownership has been performed, the notice cannot affect it. The preference or standing of the notice is limited, then, to the subsequent acquirers, except in exceptional cases.

This is fundamentally the view held by the generality of authors. III Morell, *Comentarios a la Legislación Hipotecaria* 322; II Barrachina, *Derecho Hipotecario* 37; III Roca Sastre, *Derecho Hipotecario* 441; II Martínez Escobar, *Las Inscripciones* 197. Against, partially, Feced Gress, *La Anotación Preventiva de Demanda, Su Valor Jurídico*, XX *Revista Crítica de Derecho Inmobiliario* 77.

To the effect, Barrachina tells us with great persuasive power:

"If it were not thus, the one who sought to buy a property would have to find out from all the courts in Spain, whether a

suit as to the ownership of the same was pending, with which, the uncertainty being sifted and under the threat of its being stripped of interests grounded in good faith, the contract would be in every manner impossible, absolutely impossible, and the institution of the registry without object, drilled in this way in its foundations."

Roca Sastre, upon formulating an orientational view about this question, denies a preferential rank to the cautionary notice of lis pendens in respect to the dispositive acts or titles granted prior to the notice, except in cases of rectification of inexactitudes in the registry, in which the notice of lis pendens always prevails. *Op. cit.* at 441.[11] Except in all those cases of correction of entries, in all the others, Roca Sastre points out, "former acts or titles prevail over the notice of lis pendens and even may originate the cancellation of the same." *Id.*

■ In summary, we decide that the cautionary notice of lis pendens does not affect the alienations performed prior to the presentation of the notice in the registry, although said alienations have not been recorded.

It is not superfluous to indicate that in several jurisdictions of the United States, a similar conclusion to the one herein adopted has been reached. *Lee* v. *Silva*, 240 P. 1015 (Cal. 1925); *Oil Fields Corp.* v. *Dashko*, 294 S.W. 25 (Ark. 1927, *cert. denied*, 275 U.S. 548); *Bateman* v. *Bachus*, 34 N.W. 66 (Dak. 1887). We merely indicate the coincidence without delving into an analysis of the decisions, because in those jurisdictions a mortgage system like ours does not exist and the rules which govern the institution of property are, in many aspects, different from the ones established in our Civil Code.

---

[11] The rectification of inexactitudes in the registry refers, generally, to curable errors which may appear from the titles in the registries or from the principal entries. See 26 *Enciclopedia Jurídica Española* 686.

—II—

*Nature and Scope of the Transaction Performed by Monacillos
Investment Corp. and Miranda & Eguía, Inc., Under the
Deeds of Sale Executed in 1960 and 1964*

We must specify, now, in the light of the applicable law, the nature and scope of the transaction performed by Monacillos Investment Corp. and Miranda & Eguía, Inc., under the deeds in question, in order to be able to determine whether by virtue of the same and of the circumstances of the case, the conveyance of ownership was performed, in which case the cautionary notice could not prejudice it.

It is known that the deed of sale only gives rise to obligatory rights between the parties. By virtue thereof, the obligation of delivering the thing object of the deed is imposed on the vendor, and on the vendee, the obligation of paying the price, both being able to compel each other to the compliance of their respective promises. Section 1334 of the Civil Code, 31 L.P.R.A. § 3741;[12] *Valcárcel* v. *Sancho, Treas.*, 61 P.R.R. 207 (1942); *Benítez* v. *Llompart*, 50 P.R.R. 641 (1936); *Vélez* v. *Camacho et al.*, 8 P.R.R. 35 (1905).

■ The contract of purchase and sale by itself does not convey the ownership over the thing sold. Our juridical system requires, for the conveyance of ownership over the thing sold, not only the agreement of wills over the thing and its price—perfecting of the contract, § 1339 of the Civil Code[13]— but, also, the tradition or delivery of the thing. Thus, § 549

---

[12] Section 1334 provides:
"By a contract of purchase and sale, one of the contracting parties binds himself to deliver a specific thing and the other to pay a certain price therefor, in money or in something representing the same."

[13] Section 1339 provides:
"The sale shall be perfected between vendor and vendee and shall be binding on both of them, if they have agreed upon the thing which is the object of the contract and upon the price, even when neither has been delivered."

of the Civil Code, 31 L.P.R.A. § 1931, establishes that: "Ownership and other property rights *are acquired and transmitted by . . . in consequence of certain contracts, by tradition.*" (Italics ours.) Section 1048 of the Civil Code specifies the judicial effects of both requisites—perfecting of the contract and tradition—in providing that:

"A creditor has a right to the fruits of a thing from the time the obligation to deliver it arises. However, he shall not acquire a property right thereto until it has been delivered to him." 31 L.P.R.A. § 3012.

The tradition or delivery is properly the manner of transmitting the ownership and other property rights over things object of contract, under the Civil Code. Sections 1351 to 1353 of the Civil Code, 31 L.P.R.A. §§ 3811–3813, establish several manners of tradition, adopting, in general terms, the different manners recognized in the Roman Law.[14] Said sections provide:

---

[14] The Roman law recognized multiple manners of tradition, many of which still are in existence in said §§ 1351 to 1353 of the Civil Code. Generally, the tradition was divided into two classes, the true or real and the fictitious (*traditio ficta*). The real tradition consisted in the material delivery of the thing, if a movable property was involved, or in the execution of certain acts, if real property was involved. The fictitious tradition comprised the so-called symbolic one, by virtue of which the delivery was performed by means of the use of signs or symbols, as the delivery of the keys, or the execution of deeds, this one also recognized as the instrumental tradition, and the ones called *traditio longa manu*, which operates indicating the property in sight of the acquirer, the *traditio brevi manu*, which operates when the vendee already has the thing in his possession by virtue of another title, the *constitutum possessorium*, which takes place when the vendor comes in possession of the property in another concept, as lessor, and the quasi tradition, which is applied to intangible things or rights. See: III Puig Brutau, *Fundamentos de Derecho Civil* 193; II Castán, *Derecho Civil Español, Común y Foral* 179 *et seq.*; X Manresa, *Comentarios al Código Civil Español* 154 *et seq.*; II-1 Puig Peña, *Compendio de Derecho Civil Español* 219; III Sánchez Román, *Estudios de Derecho Civil* 250; Guaroa Velázquez, *Derechos Reales Principales* 332 *et seq.*

Section 1351:

"A thing sold shall be considered as delivered, when it is placed in the hands and possession of the vendee.

"When the sale should be made by means of a public instrument, the execution thereof shall be equivalent to the delivery of the thing which is the object of the contract, if in said instrument the contrary does not appear or may be clearly inferred."

Section 1352:

"With the exception of the cases mentioned in the preceding section, the delivery of personal property shall be made by the delivery of the keys of the place or depository where it is stored or kept, and by the mere consent and agreement of the contracting parties, if the thing sold cannot be transferred to the possession of the vendee, at the time of the sale, or if the latter already held it in his possession for any other reason."

Section 1353:

"With regard to incorporeal things, the provisions of the second paragraph of section 3811 of this title shall govern. In any other case in which it cannot be applied, the placing of the titles of ownership in the possession of the vendee or the use which he may make of his right with the consent of the vendor shall be considered as a delivery."

■ The recital of the different manners of delivery contained in the foregoing sections is not of a limitative character. The delivery may be performed by means of other forms or manners according to the nature of the thing sold and the circumstances of the contract. Manresa, *supra* at 157, Castán, *supra* at 229, Velázquez, *supra* at 336. To that effect, Castán states that the Civil Code disregards the technicisms of the Roman law, without waiving the enumeration of the manners to perform the delivery in the cited sections, equivalent to §§ 1462, 1463, and 1464 of the Spanish Civil Code, "although these are variable ad infinitum. . . ." *Op. cit. supra* at 228–229.

Manresa, specifically raises the point, commenting:

"Does that enumeration have a limitative character so that

it will not be possible to consider that there is a delivery of the thing, unless the same is done in some of the manners which the articles that we commented on establish? We understand that no. In the same manner that some of these methods may not constitute a delivery when it is established that the intent to deliver does not exist, provided there exists some act not comprised in the sections to which we refer, but which is accompanied by the evident purpose on the vendor's part to deliver, and on the vendee's to receive, the tradition should be understood as verified by virtue of that sole act. If the element of will is essential, what has to be proven is that it existed, in one manner or another." Manresa, *op. cit.* at 158.

Before the inexhaustible variety of methods of tradition, it is inescapable to consider the essential elements of the delivery in order that, in recognizing them, we may determine their operation in specific cases.

Section 1351, *supra*, establishes the policy for the delivery, establishing that it will be understood as done when the thing sold is placed in the *hands* and *possession* of the vendee.[15] This section refers to the conveyance of the juridical possession which does not necessarily assume the transmission of the material deforcement of the thing sold. IV Castán, *op. cit.* at 334, Puig Brutau, *supra* at 183. Nor does it imply, either, a conveyance of the possession in fact, for it may be carried out, as we have seen previously, in a symbolic manner: execution of titles or delivery of keys. Sections 1351 and 1352, *supra*. Remember in the matter, the *traditio longa manu*, where the property is merely indicated to the acquirer, or the

---

[15] The use of these concepts of placing in the hands (*en poder*) and possession (*posesión*) has been the cause of ample conflict. Some authors assimilate the concept of placing *in the hands,* to that of ownership. Puig Peña, *op. cit.* at 219. Castán understands both concepts in a joint sense, "without it being possible to separate the conveyance from the possession and the conveyance from the ownership in the deed of purchase and sale, as different acts or moments." IV Castán, *op. cit.* at 88. Others interpret that the concept of placing *in the hands* is used within the context of § 1351 to reenforce the concept of possession, as a redundancy. See, Moreno Mocholi, *¿Es Esencial a la Compraventa la Obligación de Transmitir el Dominio?*, 18 *Rev. Crítica Derecho Inmobiliario* 377, 387.

*traditio constitutum possessorium,* which operates when the vendor continues deforcing the material possession by virtue of a lease, that is, exercising the possession in fact. See footnote 14. As Puig Brutau correctly indicates, it is not a question of a *physical* reality, but of a *concept. Op. cit.* at 184.

The tradition as a juridical concept consists in placing the thing at the vendee's disposal in order that he may exercise ownership over the same. The authors enumerate the following requirements: (a) that the one who conveys be the owner of the thing, (b) the existence of a just cause for the conveyance, (c) the will to convey and to acquire in the transferor and in the acquirer, (d) their capacity to convey and acquire, and (e) material or symbolic act which manifests it. See Sánchez Román, *op. cit.* at 245, 246; II Castán, *op. cit.* at 222; Puig Peña, *op. cit.* at 218, 219.

In the case at bar the record shows that:

(a) The transferor, Monacillos Investment Corp., was the owner of the lots in question, having acquired title over the same by virtue of deed No. 24 of April 9, 1957, executed before Notary Iván Díaz de Aldrey, title which appears recorded at folio 10, back of volume 371 of Monacillos, Registry of Property of Río Piedras, property No. 14075.

(b) The just cause for the conveyance of ownership to Miranda & Eguía, Inc., appears in the corresponding contracts of sale. In the contract executed in 1960, a price of $35 per square meter was agreed upon, Miranda & Eguía, Inc., having delivered on the act of the signing of the contract, the sum of $2,000 as part of the price. Likewise, in the contract executed in 1964, a price of $40 per square meter was agreed upon, Miranda & Eguía, Inc., having delivered the amount of $60,000 as part of the price.

(c) The will to convey and to acquire appears clearly stated in the terms of the contracts. In both it is expressly provided that:

"The Monacillos Investment Corp. sells, assigns, and conveys to the corporation Miranda & Eguía, Inc., the lot described in the first paragraph of this contract, *the vendee being entitled to the possession of the same from this date on.*" (Italics ours.)

As to this requirement about the will to convey and to acquire, the express agreement between the parties suffices for the delivery to be considered as performed. To the effect, Manresa says, *op. cit.* at 157:

"The Code, in the sections which we have commented on, has been enumerating the different manners about how the thing may be delivered. In all of them it may be seen that what gives legal life to the act of the delivery is essentially the determination of the will of the parties to deliver and receive, respectively. When the thing is placed in the hands and possession of the vendee; when a symbol whose normal and ordinary symbolism consists in assuming the delivery is used; when there is *an express agreement about this point,* or when, knowing the value which the law gives to the execution of the deed, the same is executed without exceptions or restrictions, it has to be understood that there has been a will to deliver and that the thing has been delivered. Finally, it involves the interpretation of an act which presupposes a determined position of the will." (Italics ours.)

In the instant case there was not only the express agreement, but also, by virtue thereof, Miranda & Eguía, Inc., has invested substantial amounts of money in studies and drawings for the construction of physical facilities on said lands, which establishes without any doubt its will to acquire. *Cf. Ferry* v. *Alomar et al.,* 15 P.R.R. 732 (1909).

(d) Neither the capacity of the Monacillos Investment Corp. to convey, nor that of Miranda & Eguía, Inc., to acquire, have been questioned.

■ (e) The execution in writing of both contracts constitutes the symbolic act which establishes the delivery. Although § 1351 refers solely to the execution of the public deed, however, we know that such provision does not have a limita-

tive character, not preventing, therefore, other manners of tradition, as the one in the instant case, where the requirements which we have mentioned previously are completely complied with.

To limit the delivery exclusively to the execution of a public deed as equivalent to the delivery would be a frivolous mechanical application of § 1351, which does not correspond to the demands of our continuous economical and social development. What is essential is that it is complied with, as it has been complied with in this case, with the requirements of the tradition. Once the parties have agreed to the delivery for just cause—the payment of $2,000 in one case and $60,000 in another—and that, even more, the acquirer has performed acts which clearly establish its willingness to acquire, the parties having capacity to convey and to acquire, we are constrained to conclude that a conveyance of ownership has been performed. The contrary will be tantamount to turn the deed into a mysterious touchstone, divorced of all reality in prejudice of the certainty and security of the real estate traffic.

In view of the foregoing, we decide that by virtue of the contracts executed by Monacillos Investment Corp. and Miranda & Eguía, Inc., in 1960 and 1964, and of the manner of delivery comprised in the same, a conveyance of the ownership of the lots in question was carried out with all the consequences of law, from the Monacillos Investment Corporation's patrimony to the patrimony of Miranda & Eguía, Inc. The ownership of said lots having been, then, conveyed prior to the cautionary notice of lis pendens, such notice cannot prejudice in any manner the conveyance of ownership.

—III—

*Nullity of the Contracts on Account of not Having Previously Obtained the Approval of the Planning Board for the Segregation of the Lots*

Section 24 of the Puerto Rico Planning and Budget Act, 23 L.P.R.A. § 25, provides that any execution of a public deed or private contract regarding subdivision will be ineffective if the Puerto Rico Planning Board has not previously approved said subdivision.

■ The trial court concluded that although when the contracts of sale were executed in favor of Miranda & Eguía, Inc., the subdivision of the lots had not been approved by the Planning Board, this was entered in the said contracts and the same were subjected to the condition that the vendor comply with the requirements of the Planning Board and, also, that the Plan of Partial Recording of the lots sold to Miranda & Eguía, Inc., was approved by resolution of the Planning Board on June 17, 1964, that is, before the complaint was filed and the lis pendens notice made. The record amply supports this conclusion. From the same it appears that the Planning Board approved on May 21, 1959, the preliminary development of the subdivision by the Report L-2000, Case No. 59-1294 lot. That is, more than a year before the contract of 1960 was executed and about four years before the contract executed in 1964. It also appears that the Planning Board approved the construction drawings, the work having been, in effect, built and the plans of partial recording for the Monacillos Industrial Urbanization finally approved on May 13, 1964.

Recently, we decided in *Meléndez* v. *Jiménez Realty, Inc.*, 98 P.R.R. 872, opinion of March 25, 1970, that a contract of sale which by its own terms is subject to the approval of segregation by the Planning Board does not violate § 24 of the Planning Act.

The fact that in the report of March 14, 1964, approving an amendment to the partial recording plan, the Planning Board stated that Monacillos Investment Corp. appeared to request said amendment as owner of the same, is not important nor affects, in any manner, Miranda & Eguía, Inc.'s, title over said lots. As appellee correctly indicates in its brief, it is a practice of general knowledge that the persons who, as owners, present the petitions for approval of projects before the Planning Board, continue appearing as such until the close of the case and all the steps are continued in their name.

The summary judgment rendered by the trial court in this case will be affirmed and the record remanded for further proceedings consistent with this opinion.

Mr. Chief Justice Negrón Fernández, Mr. Justice Blanco Lugo, and Mr. Justice Dávila did not participate herein.